IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2024 Session

## VICKI MARLENE (ALMONRODE) TAYLOR v. JACK ELMER TAYLOR, JR.

**Appeal from the Chancery Court for Cannon County**
**No. 20-477    Bonita Jo Atwood, Judge**

———————————————————

**No. M2022-01254-COA-R3-CV**

———————————————————

Husband appeals aspects of the trial court's classification, valuation, and division of property in its order of absolute divorce. The trial court's decision is affirmed in part, vacated in part, and reversed in part, and the matter is remanded to the trial court for further consideration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Reversed in Part**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Benjamin Lewis, Murfreesboro, Tennessee, for the appellant, Jack Elmer Taylor, Jr.

L. Jeffery Payne and Laurie Y. Young, Murfreesboro, Tennessee, for the appellee, Vicki Marlene (Almonrode) Taylor.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from a complaint for divorce filed by Plaintiff/Appellee Vicki Marlene (Almonrode) Taylor ("Wife") in the Cannon County Chancery Court ("the trial court") in September 2020. Therein, Wife alleged that irreconcilable differences had arisen between herself and Defendant/Appellant Jack Elmer Taylor, Jr. ("Husband") and that Husband was guilty of inappropriate marital conduct. Wife requested an absolute divorce,

an equitable division of the parties' property, both pendente lite and permanent alimony,[1] and her attorney's fees.

Husband's answer denied any irreconcilable differences in the parties' marriage and any inappropriate marital conduct on his behalf. Husband also raised the affirmative defenses of provocation and unclean hands.

Wife filed a motion for pendente lite relief in December 2020, seeking either assistance with feeding the parties' livestock or permission to sell the livestock, and either permission to sell the marital residence or assistance with paying the mortgage. Wife also requested a temporary order related to the payment of marital expenses, farm and livestock expenses, and temporary spousal support.

The motion was heard in June 2021. By order of July 9, 2021, the trial court found that Husband was not credible and did not know his own expenses or the expenses required to maintain the marital residence. The trial court further found that Husband could not afford to maintain the parties' farm property or refinance the parties' marital residence. Accordingly, the trial court directed that both the marital residence and the farm plot be sold, with the proceeds deposited with the Clerk and Master, who was appointed Special Commissioner over the sales. The parties' livestock would also be sold, with those proceeds and the proceeds Wife had previously received for other animal sales deposited with the Clerk and Master.

As Special Commissioner, the Clerk and Master entered her report of the sale in August 2021. The report indicated that the marital residence plot was sold for a total of $305,000.00, and the farm plot was sold for $300,000.00. After costs and expenses were paid, $582,348.80 would be deposited with the Clerk and Master pending further orders from the trial court. On Wife's motion, the trial court entered an order approving the sales in September 2021.

The matter was set to be heard July 19, 2022. Both parties filed statements of issues, income, and expenses, and statements of assets and liabilities prior to trial. Wife testified to two incidents of violence against her by Husband in September and November 2020 and requested the reimbursement of $2,049.85 in medical bills.[2] Wife explained that she took over the mortgage payment for the parties' marital residence after Husband was arrested in relation to these incidents in September 2020. As she moved out of the property based on Husband's actions, Wife requested to be reimbursed for paying the entire $2,045.00 per month for fourteen months. Wife also asked to be reimbursed for her payment of the entire electricity bill during that same time. Wife requested the reimbursement of several additional expenses, including for feeding the livestock, maintaining the farm, adding

---

[1] At trial, Wife voluntarily withdrew her request for alimony.
[2] On cross-examination, Wife admitted that this amount included some bills twice.

security features to the property, and getting both the farm and the residence ready for sale. Wife provided copies of her paystubs for April through June 2022, and testified to having paid a total of $8,500.13 in premiums to cover Husband's health insurance since filing for divorce. Wife also requested $17,666.00 in attorney's fees.

Wife explained that Husband was allowed back into the marital residence for a three-week period in July 2021. Wife testified that Husband took several items from the home that she had marked as wanting to keep, as well as his own tools and several pieces of farm equipment.[3] Wife explained that multiple items of marital property were listed for sale online by Husband and were not on the property when he left; she did not know if these items were sold or what happened to any sale proceeds. Wife also provided photographs of the derelict state the property was in when Husband left at the end of the three weeks. Wife further explained that the electric bill was usually only $60.00–$120.00 per month, but that Husband kept all of the lights on and the thermostat set very low during his time in the home, resulting in a bill of approximately $169.00 for those three weeks. Wife requested reimbursement of this amount.

Wife testified that she took from the home several pieces of heirloom furniture, some dishes and knives, and the other assorted items she brought into the marriage. Wife removed twelve firearms and assorted ammunition from the residence after the first domestic violence incident.[4] Wife testified that she attempted to bring the firearms to the Sheriff's Department but eventually stored them with her brother instead.[5] She explained that no firearms had been sold or otherwise disposed of, despite Husband listing seventeen firearms in his pre-trial documentation. Wife testified that most of these firearms were Husband's separate property but that several were acquired during the marriage. Wife testified that she was "[t]errified" of the firearms being returned to Husband and requested that the trial court arrange for the sale of the firearms and award Husband the proceeds.

Wife testified to an annual income of approximately $65,000 or $70,000.00. Wife provided a June 2022 statement showing $8,733.90 in stock provided as a benefit of her employment. Wife also provided statements reflecting a balance of $12,848.80 in her 401(k) account prior to the marriage and a balance of $103,488.01 at the time of the hearing. Wife explained that a total of $63,000.00 was withdrawn from her 401(k) account during the divorce action to pay for "legal fees and to maintain the farm. Basically, living expenses." Wife paid a total of $12,600.00 in taxes on these withdrawals. Wife further

---

[3] Wife testified as to the types of tools Husband owned and explained that "$50,000.00 is probably an understatement for the value of those tools. I just pulled it out of the air, but it -- he had a lot of tools." Similarly, Wife testified that she did not know the value of the parties' vehicles and farm equipment but that she had looked the values up online.

[4] Wife presented a photograph of those firearms she found and removed from the residence, and Husband was able to identify the firearms pictured.

[5] Wife explained that she had retained one pistol for personal safety, but that she did not want to keep the pistol after the divorce.

testified to having a total of approximately $555.00 in her two bank accounts, such that the funds withdrawn were fully utilized. There was testimony regarding Wife's tax filing status, as she often filed as a single status during the majority of the marriage. Wife explained that Husband identified as a "sovereign citizen," believed he did not have to pay taxes, and did not provide her with his social security number to be able to file under a married status. Wife explained that she did not alert the government to Husband's failure to pay his taxes based on her desire to avoid legal trouble for Husband.

Husband explained that he was self-employed primarily through his sole proprietorship business. Husband testified that his average gross income was $15,000.00 per month, but that his earnings each month "varie[d] dramatically" and his net income was somewhere between $5,000.00 and $6,000.00 a month.[6] Husband requested that his tax debt of $46,363.00 from 2018–2020 be considered marital debt, as he had believed that Wife had been filing tax returns for both of the parties during the marriage. Husband denied considering himself a "sovereign citizen" but admitted that he had not filed his taxes from 2001 to 2020.

Husband consistently requested that the marital property be split evenly. Husband also requested that the $63,000.00 withdrawn from Wife's 401(k) account be included back into the balance of the account for distribution purposes. Husband explained that Wife had never before asked him to pay her back for his health care premiums, and that the parties had always paid the mortgage and utility bills out of a joint account. Husband testified that he had been wholly responsible for the upkeep and running of the farm prior to the divorce petition. Husband admitted that he did not contribute to the mortgage payment or to the farm expenses during the pendency of the divorce action. Although Husband did not "begrudge [Wife] what she spent to feed the animals[,]" he considered the amount to be "exorbitant." Husband also disputed that some of Wife's purchases needed to be made and did not want to split those costs, including the costs for Wife to add additional security features to the property. Husband explained that his tools had all been acquired prior to the marriage, and that even his provided value of $15,000.00 was "a very high estimate." Husband admitted that he guessed at or made up the values of several items.

Husband testified that he only returned to the marital residence to remove his property prior to the sale of the house for nine days in July or August 2021. He explained that he removed some furniture, the majority of his tools, and multiple vehicles from the residence. Husband testified that he sold the farm truck, a four-wheeler, two lawn mowers, and several pieces of farm equipment, and that he put the proceeds into his bank account

---

[6] Husband later agreed with his counsel that his net monthly income was somewhere between $4,500.00 and $5,000.00. Husband provided a 2020 tax return filed as married but filing separately, indicating $58,104.00 in income.

because he did not think these items were marital property.[7] Husband explained that he uses the farm equipment remaining in his possession for his business.

Husband explained that his son, his brother, and Wife each possessed some of his guns, as he was currently prohibited from possessing them himself. Husband was eventually able to identify each of the twelve firearms included in the picture provided by Wife, noting that one firearm had not been included in his pre-trial disclosures. Husband admitted that he had not previously disclosed the firearms held by his brother and son. Husband explained that his wish was for the firearms to be returned to a family member or his pastor, and that he had not asked Wife to return the firearms to him directly. He testified that only three of the eighteen firearms were purchased during the marriage. Husband stated that he would be willing to provide Wife with half of the value of the marital-property firearms if he could keep the firearms themselves.

The trial court entered its final order of divorce on August 9, 2022. An amended final judgment of divorce was entered September 1, 2022. Therein, the trial court granted Wife a divorce on the ground of inappropriate marital conduct, and classified, valued, and distributed the parties' property. The trial court found that Wife's testimony was credible and Husband's testimony was not credible, with Husband's answers being "evasive, vague, inconsistent, deceptive, untruthful, dishonest, antagonistic and problematic." The trial court also outlined the violence by Husband against Wife in 2020.

The trial court found that Wife provided evidentiary support for her testimony that her net monthly income was $3,574.66 and that although Husband testified to $15,000.00 in gross monthly income and $4,500.00–$5,000.00 in net monthly income, he did not provide proper evidentiary support. The trial court found that Wife made $28,635.88 in mortgage payments and $1,400.00 in electrical services payments during the pendency of the divorce action without contribution from Husband. The trial court described several other payments made by Wife during the litigation, including $169.45 for electrical services while Husband was living alone in the residence, $8,500.13 for insurance for Husband's benefit, $15,347.30 in farm expenses, and $2,477.90 spent to ready the parties' residence for sale. As separate property, the trial court awarded Wife the $12,848.80 pre-marital balance of her 401(k) account; Husband was awarded eight firearms.

In its consideration of the statutory factors relevant to the distribution of marital property, the trial court found that the parties had similar financial needs, abilities to earn future income, and contributions to the marital estate. The trial court found that Wife earned less during the marriage, and that Wife had less disposable income. The trial court also found that Husband removed and sold marital property without accounting for the proceeds or recalling which property he removed. The trial court noted that the parties had

---

[7] Husband testified that he was "on medication" and "so confused and emotionally disturbed that week[,]" that he did not "remember what was sold, to whom it was sold, [or] how much it was sold for."

provided conflicting testimony as to the value of several items of marital property, but that Wife explained that her values came from the Kelley Blue Book and Husband did not provide testimony or evidentiary support as to his values.

The trial court made the following initial valuation and division of the parties' marital property:

| Marital Property Awarded to Wife | | Marital Property Awarded to Husband | |
|---|---|---|---|
| Post-marital 401(k) Balance | $90,639.21 | Pinnacle Account | $2,000.00 |
| 2013 Acura | -$3,139.00[8] | Pinnacle Account | $10,000.00 |
| Pinnacle Account | $400.00 | 2014 Mercedes | $11,000.00[9] |
| Outreach FCU Account | $155.93 | 2000 Ford | $10,000.00 |
| Livestock Sale Proceeds | $3,155.56 | 2014 Ford | $14,000.00 |
| Plants | -- | 2000 Mercedes | $2,500.00 |
| | | 2000 Kubota | $10,000.00 |
| | | 2018 Kioti | $20,000.00[10] |
| | | 2014 Polaris | $4,000.00 |
| | | 2017 Trailer | $2,00.00 |
| | | John Deere | $650.00 |
| | | Farm Truck | $1,000.00 |
| | | Tools | $32,500.00 |
| Total | $91,211.70 | Total | $119,750.00 |

Although the trial court listed several additional firearms as marital property, these items were not included in the court's distribution. The parties were responsible for any debts in their individual names and their own attorney's fees.

The trial court then awarded both parties $135,634.70 in proceeds from the sale of the marital real property. Husband's award was reduced, and Wife's award increased, by the following amounts, associated with Wife's payments during the pendency of the action:

| | |
|---|---|
| Full Mortgage Payment Reimbursement | $28,635.88 |
| Half Electrical Services Reimbursement | $700.00 |
| Full Husband's Electrical Services Reimbursement | $169.45 |
| Full Insurance Reimbursement | $8,500.13 |

[8] This award includes the trial court's finding of a $10,190.00 fair market value for the vehicle and a $13,329.00 debt associated with the vehicle.
[9] This award includes the trial court's finding of an $18,000.00 fair market value for the vehicle and a $7,000.00 debt associated with the vehicle.
[10] This award includes the trial court's finding of a $30,000.00 fair market value for the tractor and a $10,000.00 debt associated with the tractor.

| Full Farm Expenses Reimbursement | $7,673.65 |
|---|---|
| Half House Sale Expenses Reimbursement | $1,238.95 |
| **Total** | **$46,918.06** |

The trial court also noticed that Husband received $28,538.30 more in the division of the parties' marital personal property and awarded Wife an additional $28,538.30 from the proceeds of the sale of the real property. Accordingly, from the $271,269.40 in real property proceeds, Husband was actually awarded $60,178.34 and Wife was actually awarded $211,091.06.

Altogether, the trial court's order valued the parties' marital estate at $482,231.10. Wife received $302,302.76, or approximately sixty-three percent of the estate. Husband received $179,928.24, or approximately thirty-seven percent of the estate. Husband subsequently filed this appeal.

## II. ISSUES PRESENTED

Husband raises the following issues, taken directly from his brief:

I. Whether the trial court erred in classifying property as marital or separate property and valuing that property, and if the trial court failed to classify certain items entirely.
II. Whether the trial court erred in making an equitable distribution of the parties' marital assets and debts.

## III. STANDARD OF REVIEW

The Tennessee Supreme Court has explained the applicable standard of review in cases concerning the proper classification and distribution of assets incident to a divorce as follows:

This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court.

-7-

> *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991).
> Consequently, where issues of credibility and weight of testimony are
> involved, this Court will accord considerable deference to the trial court's
> factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007)
> (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915
> (Tenn. 1999)). The trial court's conclusions of law, however, are accorded
> no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d
> 741, 744–45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). As such, our role is simply to "determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in [Tennessee Code Annotated section] 36-4-121(c) is consistent with logic and reason, and whether the evidence preponderates against the trial court's division of the marital property." *Farnham v. Farnham*, 323 S.W.3d 129, 141 (Tenn. Ct. App. 2009) (citations omitted).

## IV. ANALYSIS

In Tennessee, the division of a marital estate is essentially a three-step process. The trial court (1) "must first identify all of the assets possessed by the divorcing parties as either separate property or marital property"; (2) then "value the marital property"; and finally, (3) "equitably divide the marital property in accordance with the factors provided in Tennessee Code Annotated section 36-4-121(c), because 'following this approach generally yields consistent and equitable results.'" *Snapp v. Snapp*, No. E2023-00251-COA-R3-CV, 2024 WL 3221027, at *3 (Tenn. Ct. App. June 28, 2024) (quoting *Melvin v. Johnson-Melvin*, No. M2004-02106-COA-R3-CV, 2006 WL 1132042, at *10 (Tenn. Ct. App. Apr. 27, 2006) (Koch, J., dissenting)). Husband argues that the trial court's order contained errors at each step in relation to various items of the parties' property. We will address each aspect of the division process in turn.

### A. Classification

The classification of property as either separate or marital is a question of fact. *Id.* (citing *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995)). Determining whether an asset is separate property or marital property "is an important threshold matter because courts do not have the authority to make a distribution of separate property." *Summer v. Summer*, 296 S.W.3d 57, 60 (Tenn. Ct. App. 2008).

Tennessee Code Annotated section 36-4-121(b)(2)[11] defines the separate property of divorcing parties, which includes, but is not limited to, property acquired by a spouse prior to the marriage. Marital property is defined in relevant part as follows:

> all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.

Tenn. Code Ann. § 36-4-121(b)(1)(A). As to the trial court's classification of property, Husband asserts two errors: the misclassification of several firearms as marital property and the failure to classify stock provided as a benefit of Wife's employment.

Husband argues that the trial court erred in not classifying all but the three firearms he admittedly purchased during the marriage as his separate property. A discussion of the proper classification of the firearms as asserted by Husband requires a review of the firearms at issue. In his pre-trial disclosures, Husband provided a list of seventeen firearms. Husband then identified another firearm at trial. The following chart contains the name of each of the firearms listed by Husband and the trial court's classification of each firearm:

| Ruger GP-100 .357 mag revolver | Marital |
|---|---|
| Heckler & Koch 9mm handgun | Marital |
| Ruger MKII .22 caliber pistol | Separate |
| Remington Model 512 .22 caliber rifle | Marital |
| Savage .270 caliber rifle | Separate |
| Marlin Model 336.30 .30/.30 lever rifle | Separate |
| Winchester Model 70 30.06 rifle | Separate |
| Remington Model 12a .22 caliber pump rifle | Marital |
| Remington Model 870 12-gauge pump shotgun | Separate |
| Iver Johnson .410-gauge single shotgun | Marital |
| Daniel Defender AR15 .223 caliber rifle | Marital |
| Arms AR15 .223 caliber rifle | Marital |
| Glock 19 9mm handgun | Separate |
| J.C. Higgins 12-gauge single shotgun | Marital |
| J.C. Higgins 20-gauge single shotgun | Separate |
| J.C. Higgins .410-gauge single shotgun | Not Classified |
| Unknown make .22 caliber derringer | Not Classified |

[11] The Legislature amended this statute in 2022. We cite to the version of the statute in effect when Wife filed the divorce complaint throughout this Opinion.

| | |
|---|---|
| Beretta 20-gauge shotgun | Separate |

The trial court expressed its dissatisfaction with Husband's testimony as to the classification of the firearms, noting that:

> Husband presented conflicting testimony as to the Firearms and Miscellaneous Ammunition listed [as] being his separate property. Husband admitted he had made the list of Firearms and Miscellaneous Ammunition from his memory and for the first time disclosed there were a substantial number of firearms being held by his brother and son. Husband did not provide proper evidentiary proof to support his narrative that the remaining Firearms or Miscellaneous Ammunition listed . . . were his separate property.

The main line of delineation between separate and marital property firearms appears to have been whether Husband was able to identify the firearm in the photograph provided by Wife: the trial court specifically classified the firearms "identified by Husband during testimony" as his separate property, with "the remaining firearms . . . which Husband could not identify" classified as marital property.

However, "separate property cannot, by definition, be included in the marital estate," and "[p]roperty should not be included in the marital estate unless a party can prove that it is marital property[.]" **Kinard v. Kinard**, 986 S.W.2d 220, 232 (Tenn. Ct. App. 1998) (citing **Cutsinger**, 917 S.W.2d at 241 (noting that, "as a threshold matter, property must first qualify as marital property under T.C.A. § 36-4-121(b)(1)(A) or T.C.A. § 36-4-121(b)(1)(B) before it can be subject to the court's powers of equitable division under T.C.A. § 36-4-121(a)(1)")). Here, Husband testified that he owned the majority of the firearms prior to the marriage. Wife also admitted that most of the firearms were Husband's separate property. Although a receipt for the Daniel Defender AR15 was the only proof of purchase entered into evidence, Husband admitted that the Daniel Defender AR15, the Arms AR15, and the Heckler & Koch 9mm handgun were purchased during the marriage. Having failed to establish when the remaining firearms were purchased, Wife, as the nonowner spouse, was unable to prove that the remaining firearms were marital property. As such, "the trial court ha[d] no authority to make an equitable division of the property." **Cutsinger**, 917 S.W.2d at 241 (finding error where the trial court awarded the wife a portion of the value of the husband's chiropractic practice where she failed to provide proof of an increase in value during the marriage).

The trial court's classification of the Ruger GP-100 .357 mag revolver, the Remington Model 12a .22 caliber pump rifle, the Iver Johnson .410-gauge single shotgun, and the J.C. Higgins 12-gauge single shotgun as marital property is therefore reversed, for lack of proof that these firearms were purchased during the marriage. We also note the trial court's failure to classify the .410-gauge J.C. Higgins shotgun and the .22 caliber derringer of unknown make. *See **Pope v. Pope***, No. M2010-00067-COA-R3-CV, 2010 WL 4272690,

at *5 (Tenn. Ct. App. Oct. 28, 2010) (noting that "it is the court's responsibility to classify all property as part of the equitable division; the failure to do so is error"). As no proof was presented to establish that these firearms were purchased during the marriage, they should also be classified as Husband's separate property. *See Clement v. Clement*, No. W2003-02388-COA-R3-CV, 2004 WL 3396472, at *8 (Tenn. Ct. App. Dec. 30, 2004) (finding that "in the absence of fact-finding we will evaluate the trial proof on [the classification and valuation] issue *de novo*").

Husband next argues that the trial court failed to classify the $8,733.90 in stock owned by Wife as either separate or marital property. *See Pope*, 2010 WL 4272690, at *5. Wife's testimony at trial that the stock was a benefit of employment that began in 2016, and that its value was accumulated during the marriage went uncontested. The proof thus establishes that the stock also falls under the definition of marital property within Tennessee Code Annotated section 36-4-121(b)(1) and should be included in the trial court's distribution of the marital estate. *See Clement*, 2004 WL 3396472, at *8; *Kinard*, 986 S.W.2d at 232.

## B. Valuation

As this Court has explained concerning a trial court's valuation of marital property:

> The value of marital property is a question of fact, and a trial court's decision with regard to the value of a marital asset should be given great weight on appeal. *See Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987); *Lunn [v. Lunn]*, [No. E2014-00865-COA-R3-CV,] 2015 WL 4187344, at *4 [(Tenn. Ct. App. June 29, 2015)]. A trial court's decision with respect to the valuation of a marital asset will be presumed to be correct unless the evidence preponderates otherwise. *See Wallace*, 733 S.W.2d at 107. The trial court should determine the value of a marital asset by considering all relevant evidence regarding value, and the parties are bound by the evidence they present. *Id.* The trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted. *Id.*

*Chase v. Chase*, 670 S.W.3d 280, 302–03 (Tenn. Ct. App. 2022). Husband assigns error to many of the trial court's valuations, including for most of his marital property, as well as the trial court's failure to value the firearms classified as marital property.

We look first to the marital property that Husband asserts was valued too highly by the trial court. The following indicates the values assigned to the disputed items by the parties, and the trial court's ultimate valuation of the property:

| Item | Husband's Value | Wife's Value | Trial Court's Value |
|------|----------------|--------------|---------------------|
| 2014 Mercedes | $15,000.00 | $18,000.00 | $18,000.00 |

-11-

| | | | |
|---|---|---|---|
| 2014 Ford F-150 | $8,000.00 | $14,000.00 | $14,000.00 |
| 2000 Kubota | $6,000.00 | $10,000.00 | $10,000.00 |
| 2014 Polaris | $2,500.00 | $4,000.00 | $4,000.00 |
| Tools | $15,000.00 | $50,000.00 | $32,500.00 |

Husband argues that, despite Wife's testimony that she did not actually know how much the items were worth, the trial court simply relied on the values provided by Wife for several items.

To be sure, Wife was very candid in her testimony that she did not personally know how much any of the vehicles were worth. However, Wife also testified that she used Google and the Kelley Blue Book to arrive at the values she provided. As to the tools, Wife admittedly "just pulled [her value] out of the air[.]"

On the other hand, Husband's values were not always reliable either. Husband provided no basis for his valuation of the 2014 Mercedes, and he agreed that his value for the 2014 Ford was made up. Husband testified that the 2000 Kubota would be worth $10,000.00, "[i]f it was in good condition," but that it was currently worth only $6,000.00 because it had been wrecked and rebuilt in 2020, after the divorce was filed and while in his sole possession. Husband testified that he sold the 2014 Polaris for $2,500.00, but later admitted that based on being "on medication" and "so confused and emotionally disturbed" that he could not "remember what was sold, to whom it was sold, [or] how much it was sold for." Husband also explained that the value he provided for his tools was an estimate.

Thus, the trial court was faced with evidence of value that was both conflicting and admittedly not especially credible. In such situations, the trial court is within its discretion to assign a value within the range of values provided, and we presume its findings to be correct unless the evidence preponderates against them. *See Chase*, 670 S.W.3d at 302–03. So too do we afford the trial court's implicit credibility determinations significant deference. *See Kautz v. Berberich*, No. E2019-00796-COA-R3-CV, 2021 WL 1034987, at *7 (Tenn. Ct. App. Mar. 18, 2021) ("We will not overturn a trial court's credibility determination—be it implicit or explicit—absent clear and convincing evidence to the contrary."). We do not conclude that the trial court erred in assigning values to these items of marital property within the ranges provided by the parties.

Husband also argues that the trial court assigned too low of a value to certain debts. He explains that his testimony regarding the $8,000.00 debt on the 2014 Mercedes went uncontested, yet the trial court found the debt to be $7,000.00. Similarly, Husband's testimony regarding the $20,000.00 debt on the 2018 Kioti was not disputed by Wife, yet the trial court found the debt to be $10,000.00. The trial court's order does not include any findings as to the value of these debts, and our review of the record has not uncovered any explanation for these discrepancies. *See* Tenn. R. Civ. P. 52.01 (requiring that courts in bench trials "shall find the facts specially and shall state separately its conclusions of law").

Accordingly, we vacate these values and remand the matter to the trial court for the entry of written findings reevaluating these issues and/or explaining the valuation chosen. *See Wilson v. Wilson*, 2021 WL 516980 at *5 (Tenn. Ct. App., 2021) (providing that in the absence of factual findings as to the value of certain marital property, we may either vacate and remand the decision or conduct a de novo review based on "the particular circumstances of the case").

Finally, we note that the trial court neglected to include the value of any of the firearms in its final order. Pursuant to our earlier classification of the majority of the firearms as Husband's separate property, this failure is rendered harmless. As to the three marital firearms, we look to the record to determine where the preponderance of the evidence lies. *See id.* Here, Husband's values were the only ones submitted; according to Husband, the three marital property firearms are worth a total of $5,100.00. Wife did not offer any values for the firearms and testified that Husband could "have the money" if the firearms were sold as she requested. We determine that it would thus be reasonable for the three marital property firearms to be valued at $5,100.00. *See Blevins v. Blevins*, No. M2002-02583-COA-R3-CV, 2003 WL 23094162, *3 (Tenn. Ct. App. Dec. 30, 2003) ("Husband and Wife both had the burden of bringing forth evidence regarding the value of marital assets, and they are bound by the evidence they present[ed], or in this case, did not present."). This amount should therefore be reflected in the calculation of the parties' total marital property awards after the firearms are distributed.

## C. Distribution

As for the final step in the division of a marital estate, Tennessee Code Annotated section 36-4-121 requires an *equitable* distribution of marital property, not an *equal* distribution. *See* Tenn. Code. Ann. § 36-4-121(a)(1) ("In all actions for divorce or legal separation, the court having jurisdiction thereof may . . . equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just."). Indeed, "[a] trial court's decision regarding equitable division of marital property 'is not a mechanical one and is not rendered inequitable because it is not precisely equal or because both parties did not receive a share of each piece of property.'" *Green v. Green*, No. W2019-01416-COA-R3-CV, 2021 WL 1343569, at *4 (Tenn. Ct. App. Apr. 12, 2021) (quoting *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994)). "The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Keyt*, 244 S.W.3d at 328. Section 36-4-121 provides a non-exhaustive list of factors to be considered by the trial court in creating an equitable division of marital property. *See* Tenn. Code Ann. § 36-4-121(c) (including eleven specific factors and a twelfth factor directing the court to consider "[s]uch other factors as are necessary to consider the equities between the parties"); *see also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-

121(c) or is not supported by a preponderance of the evidence").

In its order, the trial court considered the majority of the section 36-4-121(c) factors to be neutral. The trial court found that this was the second marriage for both parties and that the parties are of a similar age and state of wellbeing, with similar earning capacities and financial needs. *See* Tenn. Code Ann. § 36-4-121(c)(1), (2), (4), (8). The trial court found that neither party contributed to the education or business of the other and that both parties contributed to the acquisition of marital property. *See* Tenn. Code Ann. § 36-4-121(c)(3), (5), (10). The main differences the trial court found included the value of the parties' separate property, as Husband did not provide a complete accounting of his firearms, and the parties' disposable income, based on Husband's failure to provide proof of having filed taxes and his failure to account for the proceeds of his sale of various marital property. S*ee* Tenn. Code Ann. § 36-4-121(c)(6), (7), (12). Considering the similarity of the parties under this analysis, Husband argues that the trial court's "completely one-sided distribution" of the marital estate "bent over backwards to punish [] Husband" and was therefore not equitable.

Husband's main argument as to the distribution of the marital estate is that Wife received too great a share of the proceeds from the sale of the parties' real property. Specifically, Husband points to the trial court (1) awarding Wife $28,538.30 as an "equalizing adjustment" to rectify Husband receiving the same amount more than Wife "in the division of the parties' personal marital property"; and (2) awarding Wife $28,635.88 as reimbursement in full for mortgage payments made during the litigation. Husband also argues that the trial court erred by not considering the $63,000.00 in withdrawals from Wife's 401(k) account during the litigation at all in its analysis. We begin with this last argument, as its resolution impacts that of the prior two.

Husband argues that the trial court erred in not including the 2020 and 2021 withdrawals from Wife's 401(k) account in the value assigned to the account. There is no dispute that the $12,848,80 balance in the account prior to the parties' marriage constituted Wife's separate property. Instead, Husband asserts that the $63,000.00 withdrawn from the account during the divorce proceedings should have been factored into the marital portion of the account's balance. Husband emphasizes that Wife admitted that this money was used to maintain the parties' farm property and to cover legal fees associated with the divorce. Yet, Wife was awarded $7,673.65 extra in proceeds from the sale of the marital property as reimbursement in full for the money spent to maintain the farm property. And although Wife requested $17,666.00 in attorney's fees, the trial court found that "[e]ach party has sufficient assets to pay their respective attorney's fees and each party shall pay their own attorney's fees." Thus, Husband argues, the trial court's failure to consider the withdrawals from Wife's 401(k) account, allowed Wife to (1) receive marital funds in recompense for expenses that Wife had already paid with marital funds, and (2) use marital funds for an expense that the trial court later found should not be paid for with marital funds. Husband also posits that factoring this additional $63,000.00 into the marital property award

received by Wife would call into question the equitability of the $28,538.30 "equalizing adjustment" Wife received to rectify the trial court's finding that Husband received a greater share of the parties' marital property.

We note that the trial court's order is silent as to the withdrawals from the 401(k) account, despite Husband raising this issue at trial. It is arguably possible to read the trial court's order as implicitly rejecting Husband's argument by virtue of the trial court not including this $63,000.00 in its valuation and distribution of the marital portion of the account. *See **Morgan Keegan & Co. v. Smythe***, 401 S.W.3d 595, 608 (Tenn. 2013) ("[W]hen construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated."). In bench trials, however, trial courts are required to do more than address arguments by implication. Specifically, Rule 52.01 of the Tennessee Rules of Civil Procedure states that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law[.]" Moreover, as this Court's jurisdiction is appellate only, we are limited to consideration of only "those issues that have been formulated and passed upon in some inferior tribunal." ***State v. Bristol***, 654 S.W.3d 917, 925 (Tenn. 2022) (internal quotation marks, brackets, and citation omitted).

Even if we were to attempt to soldier on and consider this issue in the first instance, we are without sufficient evidence to properly consider the effect of these withdrawals on the distribution of the parties' marital estate. Tennessee Code Annotated section 36-4-121 is clear that withdrawals from a retirement account containing marital property must be considered in the distribution of the account incident to divorce. Tenn. Code Ann. § 36-4-121(b)(1)(B)(iii) (explaining that the purposes to which withdrawn funds are put influence how the funds are classified). This in turn relies on the intricate classification of the funds in the account. Tenn. Code Ann. § 36-4-121(b)(1)(B)(iii) (requiring trial courts to separate as best as possible the "postmarital appreciation to the value of the premarital benefits," from the "contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions").[12] Without an understanding of how much of the account was actually marital property, we cannot say how the $63,000.00 in withdrawals affects Wife's award. In turn, without an accurate accounting of the value of the marital property received by Wife, we do not have a full picture of the distribution of the marital estate, thus hampering our ability to determine whether the division was equitable. *See **Kinard***, 986 S.W.2d at 233 (noting that while the division of retirement benefits "need not be mathematically precise[,]" it must "reflect essential fairness in light of the facts" (citations omitted)).

---

[12] *See **Erdman v. Erdman***, No. M2018-01668-COA-R3-CV, 2019 WL 6716305, at *3 (Tenn. Ct. App. Dec. 10, 2019) (noting that the specificity in classification required by subsection (iii) was a new directive to trial courts, and that "[p]reviously, it was the law that *any* gain to such a 401(k) account that accrued during the marriage would be deemed marital property").

Given the substantial value of the withdrawals from the account, the potential effect of including this amount into the analysis of the parties' awards, the intricacies of properly evaluating both the account and the withdrawals as directed by section 36-4-121, and the lack of factual findings as to these questions, the trial court's classification, valuation, and distribution of Wife's 401(k) account must be vacated. *See Wilson*, 2021 WL 516980 at \*5 (including "the adequacy of the record [and] the fact-intensive nature of the case" among the "particular circumstances" that would support the vacating of a trial court's decision not sufficiently supported by factual findings); *Mumford*, 2004 WL 483213, at \*9 ("A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court."). The trial court, in its discretion, may hear additional proof, including expert proof, to resolve this issue. *Erdman*, 2019 WL 6716305, at \*3.

In light of the unresolved 401(k) matter, we must also vacate the trial court's distribution of marital property at large. *See id.* (vacating the overall division of property after reversing the classification of the husband's retirement accounts based on the requirements of section 36-4-121(b)(1)(B)(iii)). As discussed in detail, *supra*, several aspects of this Opinion will also affect the ultimate distribution of the parties' marital estate. The three firearms classified as marital property need to be distributed to a party, adding $5,100.00 to that party's award. The $8,733.90 in marital property stock must also be distributed, with its value included in the receiving party's total award. *See Hill v. Hill*, No. M2011-02253-COA-R3-CV, 2012 WL 4762110, at \*3 (Tenn. Ct. App. Oct. 5, 2012) (noting that "this court cannot evaluate the equity of the trial court's division of the marital assets (and debts) without a valuation and division" of all of the parties' assets); *Pope*, 2010 WL 4272690, at \*6 ("In light of the court's failure to classify and assign values to all marital property, there is insufficient evidence to support the division of marital property."). So too might Husband's award need to be adjusted based on the trial court's consideration of the discrepancies in the value of certain debts and the various reimbursements made to Wife out of the proceeds of the marital residence.[13] *See Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998) ("The dissolution of a marriage requires the courts to engage in the orderly disentanglement of the parties' personal and financial affairs. Many of the issues that must be addressed during this process are interrelated, and the disposition of earlier issues directly influence the decision on later issues."). We therefore vacate the distribution of marital property ordered by the trial court and remand for further proceedings in light of this Opinion. The trial court, in its discretion, may consider additional evidence, as necessary, to resolve these issues.

## V. CONCLUSION

---

[13] As "the justness of a particular division of the marital property and allocation of marital debt depends on its final results[,]" Husband's argument regarding the trial court awarding Wife the entire $28,635.88 in mortgage payments made during the course of this litigation is pretermitted by our decision to vacate the trial court's division of marital property. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 WL 47944, at \*4 (Tenn. Ct. App. Feb. 9, 1998)).

The judgment of the Cannon County Chancery Court is affirmed in part, vacated in part, and reversed in part, and this matter is remanded to the trial court for proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant Jack Elmer Taylor, Jr., and one-half to Appellee Vicki Marlene (Almonrode) Taylor, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE